UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

KATHERYNE POLTER,                  )
                                   )
          Plaintiff,               )
                                   )
     vs.                           )          Case No. 4:10CV1965 CDP
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
                                   )
          Defendant.               )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Katheryne Polter's application for

disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§

401, *et seq.* and supplemental security income under Title XVI of the Act, 42

U.S.C. §§ 1381, *et seq.*  Claimant Polter brings this action asserting physical

disability because of back pain following disc surgery, lupus, and asthma; and

mental disability because of anxiety, agoraphobia, and depression.  The

Administrative Law Judge concluded that Polter was not disabled.  Because I find

that the decision denying benefits was supported by substantial evidence, I will

affirm the decision.

## **Procedural History**

On June 4, 2008, Katheryne Polter filed for Supplemental Security Income payments and Disability Insurance Benefits.  The Social Security Administration denied her claims on September 4, 2008, and she filed a request for a hearing on September 24, 2008.  Polter then appeared and testified at a hearing on September 29, 2009.  The Administrative Law Judge issued an opinion on November 9, 2009, upholding the denial of benefits.  On August 26, 2010, the Appeals Council for the Social Security Administration denied Polter's request for review.  The ALJ's opinion thus stands as the final determination of the Commissioner.  Polter filed this appeal on October 19, 2010.

## **Testimony Before the ALJ**

At the time of the administrative hearing, Polter was forty-two years old, and she had completed the twelfth grade.  She also completed two years of training to become a veterinary assistant.  She has never been married, and she resides with her parents.  She was 5' 8" tall and weighed 250 pounds.  She has the ability to read, write, and do simple arithmetic, but some of those abilities have significantly decreased because of her medical problems.  She smokes about three-quarters of a pack of cigarettes each day, but she does not drink alcohol.  She previously had an alcohol problem that resulted in two convictions for driving under the influence.

She admitted smoking marijuana a few times in high school but denied using any other drugs.

Throughout the day, she tries to help her parents with household chores. Before her back injury, she did laundry, dishes, made the bed, ironed, vacuumed, swept, took the trash out, and did yard work.  At the time of the hearing, she was still able to help with laundry, cooking, and dishes.  She can also do other chores, such as vacuuming, depending on how she feels on a particular day.  Sometimes she is able to drive, but she often has someone else drive her instead if she does not feel capable of driving herself.  She stated that she can sit or stand for only about ten minutes at a time without pain, and she can walk about ten to fifteen minutes at a time if on a flat surface.  She can only lift the weight of about a half-gallon of milk without pain.  As a hobby, she owns a quarter horse and she likes to spend time with it and groom it.  She also rode her horse in shows once each year in 2007, 2008, and 2009.

Polter has not worked since she filed for social security benefits.  Her most recent job was as a medical transcriptionist for about one year, primarily working remotely from home, though she had worked in that capacity for various doctors' offices since 1993.  She stated that she left that job on November 13, 2007, because she was passing out while trying to read the screen and her typing speed was decreasing, so she felt that she had to leave the job because of her compromised

abilities.  However, she then alternatively explained that the doctors' offices decided not to allow her to work from home anymore because of concerns about the privacy of those medical records, and that they also changed to using a digital transcription service instead.

In addition to the medical transcription jobs, she also owned her own glass etching business from October 2006 to November 2007, but she only received a few orders in that time period.  She cleaned doctors' offices at night from 2006 through 2007.  Also, she has worked periodically as a horse trainer for local horse shows.

Polter also testified about her medical problems at the hearing.  She stated that she had back surgery for a bulging L4-L5 disc in her back after chiropractic visits and injections were unsuccessful.  Even after the surgery, she stated that she cannot find a comfortable position and has trouble sleeping because of the pain, which is in her back and all the way down her right leg to her foot.  Her pain medication only brings the pain down from a nine, on a ten-point scale, to around a seven or eight.  Other than the pain medication, she does some stretching and still receives injections in her back.

She also testified that she has systemic lupus.  Her test results show that she has the ANA factor present in lupus, but she does not have all of the symptoms associated with a lupus diagnosis.  However, she has been taking medication for

lupus for several years, including oral steroids.  As a child, she suffered from weakness, confusion, and falling, and her hair eventually started falling out.  Since 2007, her lupus has caused pain in her skin, muscles, and bones, swelling in her hands and legs, and she still has hair loss and mental confusion, primarily short-term memory loss.  When she has a flare up of her lupus, she takes oral steroids, which cause her to experience shakiness, irritability, and vision problems.

She has also been experiencing problems with fainting and blacking out, but doctors have not been able to resolve them or pinpoint their cause.  Since 2007, these black outs happen at least weekly.  She explained that she feels like someone pushes her very hard from her back, causing her to fall and then pass out for a few minutes.  This has also contributed to her short-term memory loss.  Finally, she has had asthma since she was a child, and she takes medication for that condition.

In addition to her physical limitations, she also has mental health issues.  Polter testified that she has social phobias, and she tries to avoid contact with other people.  She is sometimes able to go to the grocery store, bank, and post office, but some days she cannot be around that many other people.  She also suffers from depression and takes medication for that condition, but she is not seeing a psychiatrist or psychologist.  She had seen a psychologist previously for anxiety and agoraphobia, but she did not agree with his methodology or suggestions, so she quit seeing him.  The only other counseling she ever received was pursuant to a

- 5 -

court order after a shoplifting charge as a juvenile.  Polter stated that her depression makes it very difficult to interact with other people at work, and it makes it hard for her to concentrate.

The ALJ also called a vocational expert (VE), Dolores Gonzalez, who had been provided with and reviewed Polter's file, including her past work history.  The ALJ asked about Polter's employment potential assuming the following hypothetical, for a person with the same education, training, and work experience: she is limited to sedentary work; she can never climb ropes, ladders, or scaffolds; she can occasionally stoop, kneel, or crouch, but can never crawl; she can understand, remember, and carry out at least simple instructions and non-detailed tasks; she can demonstrate adequate judgment to make simple, work-related decisions; she can respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others is casual and infrequent; and she can adapt to routine, simple work changes.  The VE testified that such an individual could still perform Polter's past work as a medical transcriptionist or electronic medical records technician.  The ALJ then asked the same hypothetical, but adding another requirement that there be a sit-stand option at the work site with the ability to change positions frequently.  The ALJ testified that such an individual could not perform any of Polter's past work, but could perform work as a surveillance system monitor, call out operator, or a table worker.  Finally, the ALJ used the same

previous hypothetical, including the sit-stand option, but with the following changes: she must maintain concentration and attention for two-hour segments over an eight-hour time period; and she requires two additional breaks in addition to the normal two breaks and a lunch break.  The VE said that such an individual would be unable to maintain competitive employment.

Polter's attorney then asked the VE about the first hypothetical, with the added limitation that she would be limited to occasionally reaching or handling bilaterally.  The VE testified that she would not be able to perform her past work with the added limitation.  Polter's attorney then asked about whether the same options would be available for the second hypothetical if the reaching and handling limitation was added to that hypothetical.  The VE testified that she could still work as a surveillance system monitor and call out operator.  Polter's attorney then asked the VE about the second hypothetical, with numerous additional mental limitations taken from a medical source statement.  (Exh. 26F).  The VE stated that the specific mental problems with understanding instructions may not preclude employment, but the problems would involve the inability to sustain an ordinary routine without special supervision and maintain regular attendance and punctuality.  These added restrictions would preclude competitive employment.

**Medical Records**

According to medical records presented to the ALJ, Polter initially injured her back in June 2007, when the horse she was riding got startled and suddenly began running, tossing her around and causing her to feel a pop in her back.  Her other medical conditions have been nearly lifelong, including her lupus and asthma.

She initially saw Dr. Murphy for her back pain on June 12, 2007.  He prescribed pain medication and stretching exercises for the pain.  She returned to him on September 12, 2007 and received an injection for the pain.  By September 24, 2007, her back pain had also moved downward to her right hip.  The pain continued to worsen and radiated down to her right foot, and the injections and pain pills were not working to significantly reduce the pain.  On October 26, 2007, Polter underwent an MRI of her lumbar spine and was diagnosed with a herniated disc, as well as a L4-5 disc extrusion with downward migration.  She also underwent an EMG test on November 6, 2007, which showed past L5 denervation that has undergone successful axonal sprouting.

On November 14, 2007, Polter saw Dr. Murphy after passing out over the previous weekend and striking her head in the bathroom.  On November 27, 2007, Polter went to the emergency room at St. John's Hospital for fatigue, bilateral lower leg edema, and some transient visual disturbances.  She saw Dr. Murphy to

follow up the following day, and he prescribed prednisone for an apparent flare up of her lupus.

During this time period of November and December 2007, Polter began seeing Dr. Doty at a pain management clinic for her back and leg pain.  Polter underwent a brain MRI because she was continuing to experience episodes of syncope, and she was also experiencing dizziness and possible concussions from related falls.  This MRI showed no abnormalities.  She saw Dr. Doty again on December 20, 2007 for muscle pain and twitching.

On December 27, 2007, Dr. Murphy referred Polter to a neurosurgeon for her low back pain due to her herniated disc and a free-floating fragment in her back.  He noted that her conservative treatment with chiropractic visits and pain medication was not helping greatly.  On January 7, 2008, she was admitted to St. John's Mercy Hospital for severe back pain, and she eventually underwent surgery performed by Dr. Backer on January 10, 2008.  This surgery consisted of a right L4-5 hemilaminectomy with right L4-5 microdiskectomy.  Polter was still experiencing significant pain after her surgery when she saw Dr. Doty on January 15, 2008, and pain medication was not helping.  That pain continued throughout the month of January.

Also ongoing throughout this time period were mental health issues for Polter.  She attended counseling with Dr. Stack on January 19, February 2,

February 16, and February 23.  He noted that she did not respond well to any of his suggestions to help with her anxiety.

By February 2008, she was still experiencing pain, so she underwent another MRI on February 14, 2008.  That MRI showed evidence of her past surgery, as well as a bulging disc at the L4-5 level.  However, it did not show any evidence of recurrent herniation after the surgery.  The surgeon believed that a nerve root may have been causing the continuing pain and that it may never get better.  However, throughout this time period, various visits to doctors' offices showed that she had normal neurological results, greater ranges of movement without pain, and usually walked with a normal gait.

By April 17, 2008, Polter still had significant back pain.  Dr. Murphy completed a medical source statement on that day.  On May 19, 2008, she saw Dr. Doty and had swelling in her hands and face, as well as a rash.  She told Dr. Doty that she had ridden her horse in a show that previous weekend, and that her leg and hip pain was worse.  Dr. Doty referred Polter to Dr. Dave for the nerve pain in her back.  She had her first consultation with him on June 27, 2008.  He believed she had failed back surgery syndrome and right lumbosacral radiculitis, and he recommended an epidural steroid injection.  Since she was suffering from cellulitis at the time of that appointment, the injection was deferred.

On July 10, 2008, Polter saw Dr. Brasington for an evaluation of her lupus and her syncopal episodes.  He diagnosed her with possible connective tissue disorder or chronic low back pain after her surgery.  Polter received her first epidural steroid injection from Dr. Dave on July 30, 2008 and received a second one on September 10, 2008.

Polter underwent a consultative mental examination with Dr. Mades, at the request of the Missouri Disability Determinations office, on August 8, 2008.  She was diagnosed with mood disorder and alcohol abuse, and Dr. Mades gave her a GAF score of 70.  A state agency psychologist, Dr. McGee, also reviewed the record and determined that the claimant had moderate mental limitations in understanding and memory, concentration, and social interaction.

On September 17, 2008, she went to the emergency room at St. Luke's Hospital when a family member found her unresponsive on the floor after she had an episode of syncope and struck her head.  She had normal results from brain scans done at the hospital, and she followed up with Dr. Murphy.  She also followed up on December 18, 2008, with Dr. Botteron, who performed an EKG on Polter with normal results.  He opined that the fainting episodes were caused by vasovagal syncope, and Polter told him she would prefer to manage the condition through lifestyle modification.

Polter returned to Dr. Doty on January 29, 2009 because the pain in her thigh had moved from the right L-5 dermatome to the L-4 dermatome. Dr. Doty ordered another MRI, which showed normal results. On February 2, 2009, she returned to the emergency room at St. Joseph Hospital for back and right leg pain after a fall. On February 10, 2009, she saw Dr. Patrick, a neurologist, for evaluation of her syncopal episodes. Polter underwent another MRI of her brain with normal results, as well as a normal electroencephalogram. She also returned to Dr. Dave for additional steroid injections on March 2, 2009 and March 18, 2009. On May 5, 2009, she returned to Dr. Patrick after an episode of syncope while driving her car. Dr. Patrick believed it could be related to a sleep disorder and ordered a sleep study.

On June 25, 2009, Polter returned to Dr. Doty after another episode of syncope, during which she fell and struck her head and her right arm. On August 31, 2009, Dr. Doty completed a medical source statement for Polter's physical limitations and a medical source statement for her mental limitations.

## Legal Standard

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Gowell v. Apfel*, 2542 F.3d 793, 796 (8th Cir. 2001). Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to

support the ALJ's conclusion.  *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000).  As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, *id.*, or because the court would have decided the case differently.  *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).  In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000) (quoting *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999)).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole to consider:

(1)    the credibility findings made by the Administrative Law Judge;

(2)    the claimant's education, background, work history, and age;

(3)    the medical evidence from treating and consulting physicians;

(4)    the claimant's subjective complaints relating to exertional and non-exertional impairments;

(5)    any corroboration by third parties of the plaintiff's impairments; and

(6)    the testimony of vocational experts when required which is based upon a proper hypothetical question.

*Brand v. Sec'y of the Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in the social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  § 42 U.S.C. 416(i)(1); § 42 U.S.C. 1382c(a)(3)(A); § 20 C.F.R. 404.1505(a); 20 C.F.R. 416.905(a).  In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five-step procedure.

First, the commissioner must decide if the claimant is engaging in substantial gainful activity.  If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities.  If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or medical facts alone, and the claimant has a severe impairment, the

Commissioner reviews whether the claimant can perform his past relevant work.  If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy.  If not, the Commissioner declares the claimant disabled.  § 20 C.F.R. 404.1520; § 20 C.F.R. 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence.  *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984).  The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole.  *See, e.g., Battles v. Sullivan*, 992 F.2d 657, 660 (8th Cir. 1990).  In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), which include:

claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

1.    the claimant's daily activities;

2.    the duration, frequency, and intensity of the pain;

3.    precipitating and aggravating factors;

4.    dosage, effectiveness and side effects of medication;

- 15 -

     5.     functional restrictions.

*Id.* at 1322.

## **The ALJ's Findings**

The ALJ found that Polter was not disabled within the meaning of the Social

Security Act from November 13, 2007 through the date of the decision.  He issued

the following specific findings:

> 1.     The claimant met the insured status requirements of the Social
> Security Act on November 13, 2007, and she remained insured
> throughout the period of this decision (Exhibit 3D/1).

> 2.     The claimant has not engaged in substantial gainful activity
> since November 13, 2007 (20 C.F.R. §§ 404.1520(b), 404.1571 *et
> seq.*, 416.920(b), and 416.971 *et seq.*).

> 3.     The claimant has the following severe impairments:
> degenerative disc disease, systemic lupus erythematosus, obesity, a
> mood disorder, and alcohol abuse (the anxiety will be considered a
> symptom of the mood disorder) (20 C.F.R. §§ 404.1520(c) and
> 416.920(c)).

> 4.     The claimant's condition has not met or medically equaled a
> listing in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§
> 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

> 5.     Within twelve months of November 13, 2007, the claimant had
> – and has continued to have – the residual functional capacity to
> perform sedentary work, except that she has required a sit/stand
> option which allows frequent change of position.  She has been able to
> stoop, crouch, kneel, and climb ramps or stairs on an occasional basis,
> but she has been unable to crawl or climb ladders, ropes, or scaffolds.
> She has been able to understand, remember, and carry out at least
> simple instructions and non-detailed tasks, demonstrate adequate
> judgment for making simple work-related decisions, respond
> appropriately to supervisors and co-workers in a task-oriented setting

where contact with others is casual and infrequent, and adapt to
routine, simple work changes.

6.     The claimant has been unable to perform her past relevant work
(20 C.F.R. §§ 404.1565 and 416.965).

7.     The claimant was forty years old on November 13, 2007, and is
now forty-two (in regulatory parlance, a younger individual) (20
C.F.R. §§ 404.1563 and 416.963).

8.     The claimant has a high school education (20 C.F.R. §§
404.1564 and 416.964).

9.     A significant number of jobs has existed for the claimant in the
national economy since November 13, 2007 (20 C.F.R. §§
404.1560(c), 404.1566, 416.960(c), and 416.966).

10.    The claimant has not been disabled in accordance with the
Social Security Act (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The ALJ doubted the credibility of Polter's testimony regarding the intensity

and frequency of her symptoms to the extent that the testimony was inconsistent

with the residual functional capacity determination and the medical evidence.  The

ALJ found that Polter was not precluded from performing sedentary work, with

certain additional limitations, because of her impairments.  Because he found that

Polter's subjective complaints and alleged limitations were not fully persuasive, he

concluded that Polter was not disabled.

## **Discussion**

When reviewing a denial of Social Security benefits, a court cannot reverse

an ALJ's decision simply because the court may have reached a different outcome,

or because substantial evidence might support a different outcome.  *Jones ex rel. Morris v. Barnhard*, 315 F.3d 974, 977 (8th Cir. 2003); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).  Instead, the court's task is a narrow one: to determine whether there is substantial evidence on the record as a whole to support the ALJ's decision.  42 U.S.C. § 405(g); *Estes v. Barnhard*, 275 F.3d 722, 724 (8th Cir. 2002).  On appeal, Polter raises one issue.[1]  She claims that the ALJ's residual functional capacity determination was deficient because it was not supported by substantial evidence in the record from her treating physicians, it included impermissibly vague limitations, and it did not consider her syncope or obesity.  Because I find that the decision denying benefits was supported by substantial evidence, I will affirm the decision.

<u>ALJ's Determination of Claimant's Residual Functional Capacity</u>

Polter first argues that the ALJ erred in determining her residual functional capacity for a variety of reasons.  A claimant's residual functional capacity is what he or she can still do despite physical or mental limitations.  20 C.F.R. pt. 404.1545(a); *Lauer v. Apfel*, 245 F.3d 700, 703 (8th Cir. 2001).  The ALJ "bears

---

[1]The claimant's brief actually classifies her argument as pertaining to two separate issues: (1) a deficient RFC determination, and (2) the ALJ's decision to disregard the opinion of claimant's treating physician.  However, claimant includes an argument regarding the weight given to another treating physician's opinion in her first RFC argument, and the purpose of both main arguments regarding the treating physicians is to challenge the ALJ's RFC evaluation. Therefore, I will address them together as one issue: the validity of the RFC determination, given several alleged deficiencies asserted by the claimant.

the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000).  Although the ALJ is not limited to considering only medical evidence in making this assessment, the ALJ is "required to consider at least some supporting evidence from a professional," because a claimant's residual functional capacity is a medical question.  *Lauer*, 245 F.3d at 704.

Here, the ALJ determined that Polter has the residual functional capacity to: perform sedentary work, as long as she has a sit-stand option that allows for frequent changing of position; stoop, crouch, kneel, and climb ramps or stairs occasionally, but never crawl or climb ladders, ropes, or scaffolds; understand, remember, and carry out at least simple instructions and non-detailed tasks; demonstrate adequate judgment for making simple work-related decisions; respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent; and adapt to routine, simple work changes.

Opinions of Claimant's Treating Physicians:

"It is the ALJ's function to resolve conflicts among the various treating and examining physicians." *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks and citation omitted).  The opinions and findings of the plaintiff's treating physician are entitled to "controlling weight" if such an opinion

is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'"  *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2)).  However, the opinion of the treating physician should be given great weight only if it is based on sufficient medical data.  *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007) (holding that a treating physician's opinion does not automatically control or obviate the need to evaluate the record as a whole); *Hacker v. Barnhart*, 459 F.3d 934, 938 (8th Cir. 2006) (upholding the ALJ's decision to discount the treating physician's medical-source statement where limitations were inconsistent with other substantial evidence in the record); *Chamberlain v. Shalala*, 47 F.3d 1489, 1494 (8th Cir. 1995) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data) (internal quotation marks and citation omitted).  "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole."  *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

Additionally, Social Security Ruling 96-2p states in its "Explanation of Terms" that it "is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with

other substantial evidence in the case record." 1996 WL 374188, at *2 (S.S.A. July 2, 1996). SSR 96-2p clarifies that 20 C.F.R. §§ 404.1527 and 416.927 require the ALJ to provide "good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s)." *Id.* at *5.

When considering the weight to be given the opinion of a treating doctor, the entire record must be evaluated as a whole. *Wilson v. Apfel*, 172 F.3d 539, 542 (8th Cir. 1999) (quoting *Cruze v. Chater*, 85 F.3d 1320, 1324-25 (8th Cir. 1996)). An ALJ is entitled to give less weight to the opinion of a treating doctor where the doctor's opinion is based largely on the plaintiff's subjective complaints, rather than on objective medical evidence. *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (citing *Vandenboom v. Barnhard*, 421 F.3d 745, 749 (8th Cir. 2005)); *see also Randolph v. Barnhart*, 386 F.3d 835, 840 (8th Cir. 2004) (holding that a doctor's opinion stated in a checklist should not have been given controlling weight because the doctor had met with the plaintiff only three times at the time he completed the form). "Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted." *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998). "An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Id.*

Regarding Dr. Murphy's opinion in this case, Polter argues that the ALJ improperly discredited some of his stated limitations and did not discuss the weight

he afforded Dr. Murphy's opinions overall.  In his opinion, the ALJ explicitly

adopted Dr. Murphy's opinions that Polter could only lift five to ten pounds, and

that she requires frequent position changes.  His failure to specifically identify

those limitations identified by Dr. Murphy with which he disagreed, however, were

not reversible error.  By specifically citing and adopting certain opinions from Dr.

Murphy, and by specific statements in the ALJ's opinion that the medical evidence

does not support a finding of disability, the ALJ adequately considered Dr.

Murphy's medical opinions in making his overall determination.  *See Black*, 143

F.3d at 386 (holding that, given the ALJ's specific references to certain medical

findings in a doctor's evaluation, "it is highly unlikely that the ALJ did not

consider and reject" his general conclusion that the claimant was disabled).

In addition to the medical source statement, Dr. Murphy also wrote a letter

that included similar limitations, as well as a statement that Polter "has a complete

and permanent disability."  Polter argues that the ALJ's failure to consider this

opinion was error.  I disagree.  "A treating physician's opinion that a claimant is

disabled or cannot be gainfully employed gets no deference because it invades the

province of the Commissioner to make the ultimate disability determination."

*House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007).  Thus, the ALJ was not

required to give any weight to this conclusory statement regarding Polter's

disability.  Furthermore, the ALJ specifically found that "the totality of the medical

- 22 -

evidence does not support a finding of disability," thus explicitly explaining that he was not giving weight to that opinion by Dr. Murphy.

As to the opinions given by Dr. Doty in this case, Polter argues that the ALJ failed to provide a proper rationale for discrediting Dr. Doty's opinions as to Polter's physical limitations; failed to explain the weight given to Dr. Doty's opinion; and improperly relied on the state agency psychologist rather than Dr. Doty in assessing Polter's mental limitations. As to the first argument, that the ALJ failed to provide reasons for discrediting Dr. Doty's opinions as to Polter's physical limitations, it is simply an inaccurate assertion. In his opinion, the ALJ specifically stated that Dr. Doty's "opinions are unpersuasive because they are not consistent with the record as a whole." The ALJ explained how the objective medical evidence in the record, including test results and physical examinations, does not support a finding of disability:

> [T]he totality of the medical evidence does not support a finding of disability. The claimant required hemilaminectomy and microdiskectomy at L4-5 in January 2008, due to herniated nucleus pulposus. A post-operative medical image of her lumbar spine nonetheless showed diffuse disc bulging at L4-5. Extensive epidural fibrosis was also shown. And notes from a treating physician show she required transforaminal epidural steroid injections in 2008. . . . Moreover, the medical record reflects that she has a history of positive antinuclear antibody test results.
>
> Yet, an electrodiagnostic study the claimant underwent in February 2008 had essentially normal results. Post-operative exams demonstrated that she had decreased lumbar range of motion and lumbar tenderness, but also demonstrated that she had a negative

straight leg raise test for sciatica, normal neurological results, normal coordination, an ability to heel walk and toe walk, a normal tandem gait, and normal sensory ability – save for slightly diminished sensation about her right foot.  A normal gait was demonstrated on all but one occasion.  Joint tenderness and swelling about the extremities, apparently due to lupus, were seldom exhibited.

As discussed above, an ALJ can disregard the opinion of a treating physician if it is inconsistent with the substantive medical evidence in the record.  Therefore, the ALJ did not commit reversible error in deciding to discredit Dr. Doty's opinions.

Polter's second argument, that the ALJ did not explain the weight given to Dr. Doty's opinion, is also explicitly refuted by the record.  As stated above, the ALJ stated that Dr. Doty's opinions regarding Polter's physical limitations "are unpersuasive because they are not consistent with the record as a whole."  This statement specifically expresses the ALJ's decision to not defer to Dr. Doty's opinions on these physical limitations, and thus to afford them little weight.  This argument therefore fails on the merits.

Polter finally argues that the ALJ improperly relied on the state agency psychologist's opinion rather than Dr. Doty's in assessing Polter's mental limitations.  Dr. Doty completed a medical source statement as to Polter's mental limitations, and she stated that Polter had moderate limitations in certain aspects of understanding and memory, concentration, social interaction, and adaptation, as well as a marked limitation in working in coordination with others without being distracted.  The state-appointed psychologist, Dr. Mades, diagnosed her with mood

disorder and alcohol abuse and also assessed her with a GAF of 70.  Another state-

agency psychologist, Dr. McGee, also reviewed the record and found only

moderate limitations in Polter's mental abilities.  The ALJ summarized all of the

evidence concerning Polter's mental health as follows:

> With respect to the claimant's mental state, the record does not show
> any visits to a psychiatrist or psychologist, and only four visits to a
> therapist, the last visit being in February 2008.  In August 2008, Lynn
> Mades, Ph.D., a consultative evaluator, diagnosed her with a mood
> disorder and alcohol abuse, but assessed her global functioning as 70.
> A score of 70 denotes that one has mild symptoms and is generally
> functioning well.  Her evaluation of the claimant's mental status did
> not show any deficits or abnormalities other than a mildly depressed
> mood, a restricted affect, and slightly limited insight and judgment.
> Although the claimant complained to Dr. Mades of suicidal thoughts,
> she denied any intent to act on the thoughts.
>
> Additionally, Judith McGee, Ph.D., a State-agency psychologist who
> reviewed the record in September 2008, believed that the claimant
> should keep social interaction to a minimum, but that she retained the
> ability to understand and perform simple work.  And, in August 2009,
> Dr. Doty opined that the claimant did not have more than moderately
> severe mental limitations, except for a marked limitation in working in
> coordination with or proximity to others without distraction.
>
> The claimant has thus had no episodes of decompensation, no more
> than mild restrictions of activities of daily living, no more than
> moderate difficulties maintaining social functioning, and no more than
> moderate difficulties maintaining concentration, persistence, and pace.

Based on this medical evidence, the ALJ determined that the specific mental

components of Polter's RFC determination were that she could: "carry out at least

simple instructions and non-detailed tasks; demonstrate adequate judgment for

making simple work-related decisions; respond appropriately to supervisors and

co-workers in a task-oriented setting where contact with others is casual and infrequent; and adapt to routine, simple work changes."

In Dr. Doty's medical source statement, she said that Polter was "not significantly limited" in her ability to carry out short and simple instructions, respond appropriately to supervisors, and respond appropriately to changes in the work setting. Therefore, none of these aspects of the ALJ's determination was actually contrary to Dr. Doty's opinion. As to the other mental aspects of the RFC determination, Dr. Doty stated that Polter has marked limitations in cooperating with and working in proximity to other workers without being distracted, and he accounted for this limitation by providing that Polter works in a "setting where contact with others is casual and infrequent." Again, this RFC limitation is not inconsistent with Dr. Doty's opinion.

The only limitation that appears to contradict Dr. Doty's opinion is the ALJ's determination that Polter could demonstrate adequate judgment for making simple work-related decisions, as Dr. Doty stated that she was moderately limited in this area. Dr. McGee opined that Polter was not significantly limited in this area. I conclude that the ALJ did not err in granting more deference to Dr. McGee's opinion on this single limitation than to Dr. Doty's opinion. First of all, Dr. McGee, as a psychologist, is a specialist in mental health issues; Dr. Doty is a pain management specialist. "The Commissioner is encouraged to give more

weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998). Further, because the ALJ adequately explained how the claimant's mental health contentions were refuted by the substantial evidence in the record, he was entitled to discredit Dr. Doty's opinions as being inconsistent with such evidence. Therefore, this argument also fails on the merits, and I conclude that the ALJ did not err in evaluating the opinions of Polter's treating physicians in making his RFC determination.

<u>Vagueness of Physical Limitations:</u>

Polter argues that the ALJ's RFC determination was also deficient because it was impermissibly vague. Specifically, she argues that although the ALJ stated that Polter would need a sit-stand option that allows for a frequent change of position, he erred in failing to indicate how frequently she would need to alternate between sitting and standing.

In the hearing, the ALJ gave a hypothetical to the VE in which Polter would require "a sit/stand option at the work site with the ability to change positions frequently." The VE specifically stated that she would no longer be able to perform her job as a medical transcriptionist "because you have to be on task[] . . . and you have to be able to be productive at the job. So you can't be sitting and standing constantly."

Under Social Security Ruling 96-9p, a "RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing."  SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996).  I conclude that the ALJ's determination that Polter must be able to *frequently* change position meets this specificity requirement.  The hypothetical posed to the VE, as well as the VE's response, addressed Polter's need to sit and stand frequently and eliminated jobs that would not allow for frequent changes of position.  *See Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001) (holding that a hypothetical requiring the VE "to limit her consideration to jobs which would 'allow for alternate sitting and standing'" sufficiently underscored the claimant's need to sit and stand at will).  There is no reason to assume that the VE's evaluation of Polter's ability to maintain employment would have been different had she been presented with a specific time period for the frequency of sitting and standing required; her opinion allowed for *frequent* changes of position, which sufficiently addressed Polter's need to alternate between sitting and standing.  Therefore, claimant's argument that the RFC is impermissibly vague fails.

Claimant's Syncope and Obesity:

Polter's final basis for arguing that the ALJ's RFC determination was deficient is that he failed to consider all of Polter's impairments, specifically her obesity and syncope.  At the administrative hearing, Polter did not testify that her

- 28 -

obesity imposed any restrictions on her ability to work.  Further, even though her obesity was noted on several medical reports submitted to the ALJ, none of the doctors ever mentioned her obesity when discussing her physical limitations. Under these circumstances, the ALJ did not err by failing to discuss Polter's obesity in detail in making his RFC determination.  *See, e.g.*, *Forte v. Barnhart*, 377 F.3d 892, 896-97 (8th Cir. 2004).  In fact, despite the lack of evidence presented about this condition, the ALJ did actually reference Polter's obesity in his opinion: "Obesity likely aggravates the claimant's lumbar condition:  she weighs about 250 pounds."  The ALJ then thoroughly analyzed the medical evidence and testimony regarding Polter's back condition in determining her physical capabilities for his RFC determination.  As discussed above, these limitations properly account for her back pain, which the ALJ specifically observed to be affected by her obesity.  Therefore, the ALJ adequately considered Polter's obesity in making his RFC determination.

As to Polter's syncope, the ALJ explained the scope of this condition as follows: "[T]he medical record establishes but one episode of syncope, in September 2008, while medical images of the claimant's brain showed no abnormality."  He further explained that this syncope could therefore not qualify as a severe impairment since there has been no medical evidence that it significantly limits her basic work activities.  20 C.F.R. § 404.1521.  In determining the effects

of Polter's syncope in making his RFC determination, the ALJ explained that there had been no medical evidence or explanation for these fainting spells. Additionally, in her testimony, Polter did not explain how these fainting spells have impacted her ability to work in any way.  The ALJ further found that Polter lacked credibility because of her participation in activities that are inconsistent with her claimed impairments, and Polter does not challenge this credibility determination on appeal.  The ALJ's RFC allows Polter to perform sedentary work; it is unclear what other limitations could be established to account for this condition, as Polter did not propose any such limitations through the medical evidence, testimony in the administrative hearing, or briefs on appeal.  Therefore, I conclude that the ALJ did properly consider Polter's non-severe syncope in making his RFC determination.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner denying benefits is affirmed.

A separate judgment in accord with this Memorandum and Order is entered this date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 29th day of March, 2012.